UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
POLCOM USA, LLC,

        Plaintiff,

      - against -

AFFILIATED FM INSURANCE COMPANY
and ZURICH AMERICAN INSURANCE
COMPANY,

        Defendants.
------------------------------X
M.A. MORTENSON COMPANY,

        Plaintiff,

      - against -

ZURICH AMERICAN INSURANCE
COMPANY,

        Defendant.
------------------------------X

**MEMORANDUM AND ORDER**

20 Civ. 9206 (NRB)

22 Civ. 0092 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    These two consolidated cases arise from an insurance coverage
dispute over a 2018 shipment of modules of pre-manufactured hotel
rooms (the "Modules") from Chojnice, Poland to Seattle,
Washington.  It is undisputed that, over the course of several
months, the Modules sustained water damage at two locations in
Washington: (i) the Port of Everett (the "Port"); and (ii) the
hotel's construction site (the "Hotel Site").  It is also
undisputed that plaintiffs M.A. Mortenson Company ("Mortenson")

-- a general contractor engaged in the construction business -- and Polcom USA, LLC ("Polcom") -- a creator, manufacturer, shipper, and installer of modular hospitality spaces -- paid millions of dollars to remediate that water damage.  However, the parties broadly contest whether, and the extent to which, plaintiffs' insurance policies with defendants Affiliated FM Insurance Company ("AFM") and Zurich American Insurance Company ("Zurich"), cover those remediation costs.[1]

Before the Court are partial summary judgment motions from all four parties, which are focused on three discrete, so-called "Phase I" issues.[2]  First, the Court must consider a set of motions between plaintiffs and Zurich.  Specifically, Polcom and Mortenson seek partial summary judgments declaring that coverage under Zurich's 2017 Master Builders Risk Policy (the "Zurich Policy") extends to insurance claims by Polcom and Mortenson for damage to the Modules incurred at the Port, while Zurich seeks partial summary judgment declaring that the Zurich Policy only covers

---

[1] Although there are pending crossclaims and counterclaims in these actions, for ease of reference we use "plaintiffs" to describe Polcom and Mortenson and "defendants" to describe AFM and Zurich unless otherwise specified.  Further, docket citations in this Memorandum and Order will be to the case captioned Polcom USA, LLC v. Affiliated FM Insurance Co., 20-cv-09206, which was designated as the "lead case" in this consolidated action.  All citations to the docket in M.A. Mortenson Co. v. Zurich American Insurance Co., 22-cv-0092 will hereinafter be cited as "Dkt. 22-cv-0092, ECF No. ___."

[2] As discussed in greater detail infra, this litigation is proceeding in multiple phases to facilitate judicial economy.

damage that occurred after the Modules left the Port and were delivered to the Hotel Site (the "Zurich Policy Coverage Issue").

Second, only if we answer the Zurich Policy Coverage Issue in favor of plaintiffs –– i.e., hold that the Zurich Policy covers damage to the Modules incurred at the Port –– do we turn to an additional set of motions between Zurich and AFM allocating coverage responsibility for that damage (the "AFM-Zurich Coverage Issue"). Here, Zurich argues that, even if its policy covers offsite water damage to the Modules, it is entitled to partial summary judgment against AFM declaring that AFM's coverage is primary for that damage under Polcom's 2016 Marine Open Cargo Policy (the "AFM Policy"). By contrast, AFM moves for partial summary judgment against Zurich declaring that it has no obligation to pay anything on the claims at issue, because the AFM Policy is excess to the Zurich Policy.

Third, and separate from the first two issues, AFM moves for partial summary judgment against Zurich seeking dismissal of Zurich's crossclaim for equitable indemnity and/or contribution in the event that Zurich is determined to have any liability to Polcom.

For the reasons stated herein, we hold that the Zurich Policy does not cover any damage to the Modules while they were stuck at the Port and consequently grant Zurich's motion for partial summary

judgment on the Zurich Policy Coverage Issue and deny plaintiffs'
motions.  Zurich's partial summary judgment motions with respect
to the AFM-Zurich Coverage Issue is thus necessarily denied as
moot, and AFM's partial summary judgment motion is denied.  Last,
we deny AFM's motion seeking dismissal of Zurich's crossclaim.

### FACTUAL BACKGROUND[3]

### I.    The Arrangement between CitizenM, Mortenson, and Polcom

On September 29, 2017, Mortenson entered into a contract with
non-party citizenM South Lake Union Properties, LLC ("citizenM")

---

[3] The following facts are drawn primarily from the parties' Rule 56.1 Statements
and the documents submitted along with each party's briefing.  All parties
submitted a Rule 56.1 Statement of Material Facts in support of their motions
for summary judgment.  See Polcom Local Rule 56.1 Statement ("Polcom 56.1"),
ECF No. 109; Mortenson Local Rule 56.1 Statement ("Mortenson 56.1"), Dkt. 22-
cv-0092, ECF No. 72; AFM Local Rule 56.1 Statement ("AFM 56.1"), ECF No. 100;
Zurich Local Rule 56.1 Statement ("Zurich 56.1"), ECF No. 118.  The parties
also submitted counter statements to each other's 56.1 Statements.  See AFM
Response to Zurich's Local Rule 56.1 Statement, ("AFM Counter Statement"), ECF
No. 124; Mortenson Response to Zurich's Local 56.1 Statement ("Mortenson Counter
Statement"), ECF No. 127; Zurich Response to Mortenson's Local 56.1 Statement
("Zurich-Mortenson Counter Statement"), ECF No. 132; Zurich Response to AFM's
Local 56.1 Statement ("Zurich-AFM Counter Statement"), ECF No. 134; Polcom
Response to Zurich's Local 56.1 Statement ("Polcom Counter Statement"), ECF No.
137; Zurich Response to Polcom's Local 56.1 Statement ("Zurich-Polcom Counter
Statement"), ECF No. 148.  Where the Court relies on facts drawn from any of
the 56.1 Statements, it has done so because the record evidence supports the
statements, no rule of evidence bars admission, and the opposing party has not
disputed the facts or has not done so with citations to admissible evidence.

In addition, the parties filed various motions to seal their memoranda
and supporting documents on the grounds that information contained therein was
designated as "Confidential Material" under the parties Confidentiality Order.
See ECF Nos. 94, 104, 111, 130, 153.  The Court granted those motions on a
temporary basis as it reviewed the parties' underlying submissions.  See ECF
Nos. 120-21, 149, 156.

However, the Court is cognizant of the "presumption of public access" to
documents filed at the summary judgment stage, see Rapaport v. Barstool Sports,
Inc., No. 18-cv-8783 (NRB), 2020 WL 1082608, at *1 (S.D.N.Y. Mar. 2, 2020); see
also Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 126 (2d Cir. 2006)
(noting that "documents submitted to a court in support of or in opposition to

to serve as general contractor of a new hotel in Seattle that would
be built using modular hotel room units at a construction site in
Seattle (the "General Contract").   Zurich 56.1 ¶ 4; Polcom 56.1
¶ 5.  The citizenM hotel would be built "almost entirely" of 228
stacked, pre-fabricated modular hotel rooms, with spaces in
between used for wiring and plumbing connections.   Polcom 56.1
¶ 13.

The General Contract contained certain provisions governing
the use of subcontractors, and stated that, "[f]or [the] avoidance
of doubt, Polcom is a "Subcontractor" under the terms of the
Contract Documents."   The agreement also required Mortenson to
"procure the manufacture and installation of the modular units for

---

a motion for summary judgment are judicial documents to which a presumption of
immediate public access attaches under both the common law and the First
Amendment"), and "bargained-for confidentiality does not overcome [that]
presumption." SET Cap. LLC v. Credit Suisse Grp. AG, No. 18-cv-2268 (AT), 2023
WL 1961280, at *2 (S.D.N.Y. Feb. 13, 2023) (quoting Bernsten v. O'Reilly, 307
F. Supp. 3d 161, 168 (S.D.N.Y. 2018)).

In addition, some of the sealed materials, e.g., provisions in the
parties' contracts, are "central to the resolution of the parties' cross-motions
for summary judgment." See Rapaport, 2020 WL 1082608, at *1.  "[O]nly the most
compelling reasons can justify sealing" such details because they constitute
"the basis for adjudication" rather than documents that "play no role in the
performance of Article III functions."  Bernstein v. Bernstein Litowitz Berger
& Grossmann LLP, 814 F.3d 132, 142 (2d Cir. 2016) (internal quotation marks
omitted).

Thus, the Court employs limited information throughout this Memorandum
and Order that it previously sealed but has determined is necessary to the
resolution of the parties' instant motions.  In addition, the parties are
directed, by September 28, 2023 to either: (i) re-file their motions to seal
setting forth the specific reasons that their proposed redactions should
overcome the presumption of public access; or (ii) file unsealed and unredacted
versions of any documents related to the instant motions that are currently
sealed on the public docket.

the Work . . . from [Polcom]."  See ECF No. 108-8, Exhibit 6 to the Declaration of John C. Ertman ("Ertman Decl.") in Support of Polcom's Motion for Summary Judgment, GC Exhibit B – Modular Unit Work ¶¶ 1, 7.

Consequently, on August 16, 2017, Mortenson subcontracted with Polcom to supply and install the Modules.  See ECF No. 108-9, Ertman Decl. Ex. 7, M.A. Mortenson Subcontract Agreement (the "Subcontract").  The Subcontract called for Polcom to, in sum and substance, manufacture, ship, and install modular components of the citizenM Hotel for a total purchase price of $15.8 million. Id. Exhibit A – Scope of Work, Exhibit B – Subcontract Price.

## II.  The Polcom-Mortenson Subcontract Provisions

The Subcontract contained specific provisions that outlined Polcom's obligations with respect to shipping and delivery of the Modules.  Of particular relevance here, the agreement called for the Modules to be delivered "DDP Project site with all transportation, freight and delivery charges, insurance and taxes paid."  Id. § 6.1 (emphasis added).  "DDP," or "Delivery Duty Paid," is an international shipping term meaning that the seller assumes all responsibilities and costs for delivering property to the named place of destination, including export and import clearances, fees, duties, and taxes.  See 1 Int'l Business Transactions, The Delivery Duty Paid (DDP) Term § 2:20 (3d ed.

-6-

2022).  In addition to the DDP term, Polcom was responsible for: (i) arranging and paying for "[t]ransportation to [the] Seattle Port" and "all transportation to the project site from the Port of Seattle," <u>id.</u> Exhibit A – Scope of Work §§ 2(v)(2), (9); (ii) "ensur[ing] all modular units [were] covered, secured[,] and protected from damage during the shipping process," <u>id.</u> § 2(v)(2); and (iii) if "staging [was] required prior to delivery to the site[,] . . . coordinat[ing] and cover[ing] all costs that might be associated with the staging of the modular units," <u>id.</u> § 2(v)(9).

The Subcontract also governed the passage of title from Polcom, as the manufacturer and supplier of the Modules, to citizenM, the ultimate purchaser.  Specifically, § 7.5 of the Agreement states:

> Subcontractor warrants and guarantees that title to all Work, materials and equipment included in an application for payment, whether incorporated into the Project or not, will pass to Owner upon receipt of such payment by Subcontractor, free and clear of all liens, claims, security interests or encumbrances.

<u>Id.</u> § 7.5.

Last, after delivery to the Hotel Site, the Subcontract obligated Polcom to perform an additional role as an installer and supervisor of the Modules, which responsibilities included supervising field work and supplying, installing, and testing

necessary materials and systems.  <u>Id.</u> Exhibit A – Scope of Work §§ 2(o)-(u).

### III. The Insurance Policies at Issue

On October 24, 2016, Polcom entered into the AFM Policy, which provided insurance for overseas shipments.  <u>See</u> ECF No. 108-13, Ertman Decl. Ex. 11, AFM-Polcom Marine Open Cargo Policy ("AFM Policy").[4]  Coverage under the AFM Policy was made on a "warehouse to warehouse" basis, thus attaching to the cargo from the time the insured goods left the point of origin and continuing until the goods reached their final destination.  <u>See</u> AFM Policy ¶ 43(a).[5]

Consistent with its obligations under the Subcontract, Polcom also obtained a "Storage Endorsement" to the AFM Policy while the Modules were stuck at the Port, which explicitly extended the AFM Policy "to cover modules valued at $14,451,657. while at Port Everett, WA awaiting transit to the construction site."  AFM Policy, Endorsement No. 20.  However, "[c]overage ceases upon arrival at construction site."  <u>Id.</u>

---

[4] The AFM Policy predates the citizenM hotel deal, and its coverage was not limited to the transactions at issue here.  <u>See</u> <u>id.</u>

[5] Specifically, ¶ 43(a) of the AFM Policy states, <u>inter alia</u>: "This insurance attaches from the time the goods leave the warehouse or point of origin for the commencement of overseas transit to final destination and continues until the goods are delivered to the consignee's or other final warehouse at the destination."  <u>Id.</u>

Separately, since July 1, 2017, Mortenson has maintained a policy with Zurich, which made coverage available on a project-by-project basis.  ECF No. 117-6, Exhibit 6 to the Declaration of Michael L. Anania in Support of Zurich's Motion for Summary Judgment ("Anania Decl."), Zurich Policy.[6]  Effective December 1, 2017, Zurich issued a Certificate of Insurance extending coverage under the Zurich Policy to the citizenM hotel project.  Polcom 56.1 ¶ 24.

## IV.  The Relevant Zurich Policy Provisions

The Zurich Policy Coverage Issue turns on the interpretation of several key provisions within the Zurich Policy, which comprise, in colloquial terms, the "who, what, and where" of coverage.

Starting with "who" is covered, the term "Insured" is not explicitly defined in the Zurich Policy, but it undoubtedly includes the "Named Insured," i.e., Mortenson, and any "Additional Insured," defined as:

> All owners, all contractors and all subcontractors of every tier, and tenants at the project location, architects and engineers . . . as required by any contract, subcontract or oral agreement for the INSURED PROJECT, including any other entity as required by the Named Insured, and then only as their respective interests may appear are recognized as Additional Insureds hereunder. As respects manufacturers and

---

[6] Coverage was automatic for projects with an estimated total limit of liability greater than $10 million and less than $200 million with an estimated project term of less than or equal to 42 months, but only for a period of up to 60 days. Polcom 56.1 ¶ 23.

suppliers, their interest is limited to their site
activities only.

<u>See</u> Zurich Policy, Policy Declarations § 3(B).

Moving to "what" is insured, the Zurich Policy covers "all
risks of direct physical loss or damage to <u>Covered Property</u>," up
to $50 million.  <u>Id.</u>, Coverages and Exclusions § 1(A) (emphasis
added).  In turn, "'Covered Property' means the "Insured's interest
in," <u>inter alia</u>, "Property Under Construction," <u>id.</u>, Coverages and
Exclusions § 2, which is defined as:

> All property, including materials, supplies, equipment,
> machinery, fill, backfill or fill additives, furniture
> and fixtures, electronic hardware and software and other
> property of a similar nature, being property of the
> Insured or of others for which the Insured may have
> assumed responsibility and is intended to become a
> permanent part of the INSURED PROJECT, the value of which
> has been included in the estimated TOTAL PROJECT VALUE
> all when used or to be used in site preparation
> (including demolition of existing structures as required
> by the contract), fabrication or assembly, installation
> or erection, alteration, renovation or construction of
> the INSURED PROJECT.

<u>Id.</u>, Definitions and Examples § 18.

Last, in terms of "where" such "Covered Property" is insured,
the Zurich Policy applies "while at the location of the INSURED
PROJECT, while in <u>temporary offsite locations</u>, and while <u>in</u>
<u>transit</u>, all within the <u>policy territory</u>."  <u>Id.</u>, Coverage and
Exclusions § 1(A) (emphasis added).  The Zurich Policy's

"Extensions of Coverage" section provides that, with respect to "transit":

> Coverage applies with respect to Covered Property from the commencement of loading at the original point of shipment anywhere within the Coverage Territory until arrival at the INSURED PROJECT or at a temporary offsite location, including shipments on inland or coastal waters but excluding ocean marine shipments.  To the extent others are responsible for loss or damage to Covered Property while in transit under terms F.O.B. to a designated location or recipient, Company shall retain the right to subrogate. . . .

Id., Coverage and Exclusions § 5(A).  Likewise, the "Extensions of Coverage" section states that a "temporary offsite locations," comprises "any location on a temporary basis anywhere within the Coverage Territory, except while in the course of manufacturing or processing at a manufacturer's or supplier's site or while in transit."  Id., Coverage and Exclusions § 5(B).  In addition, the "policy territory," i.e., "Coverage Territory," means "[t]he United States of America (including its territories and possessions)," id., Policy Declarations § 5(A), and "[i]f the property is in transit by a vessel that originated outside of the coverage territory . . . then the coverage commences when the property has been fully discharged from the vessel onto a point

within the coverage territory." Id., Coverage and Exclusions §
5(C) (emphasis added).[7]

**V.   The Manufacture of, Transport of, and Damage to the Modules**

Polcom manufactured the Modules in Chojnice, Poland between
December 2017 and June 2018, after which they were loaded onto a
cargo ship in July 2018 for transport to the United States. Polcom
56.1 ¶¶ 12, 28. The Modules arrived at the Port on August 11,
2018 and were fully unloaded by August 13, 2018. Id. ¶¶ 29-30.

However, following unloading, a crane operators' strike
delayed transport of the Modules from the Port to the Hotel Site,
and the Modules were staged outside at the Port without cover for
the duration of the strike. Id. ¶¶ 31, 35.

When it became clear that the Modules would be stuck at the
Port, Mortenson and Polcom confirmed Polcom's contractual
obligations with respect to insuring the Modules for any damage
suffered during the storage as well as the transportation to the
Hotel Site by amending the Subcontract. Zurich 56.1 ¶ 16.[8] As

---

[7] These provisions are only applicable if the property at issue meets the
definition of "Covered Property." Id., Coverage and Exclusions § 1(A).

[8] The amendment stated:

Ocean Marine Cargo and Inland Transit Insurance covering all
shipments of the equipment from the time the equipment (or
components thereof) leave the manufacturing facility while being
transported over land and sea, until such shipments reach the
Project site. Such Marine Cargo and Inland Transit insurance shall
be on an "all risk" basis with full replacement cost coverage. Such
policies shall be at the sole cost and expense of Subcontractor.

-12-

noted <u>supra</u>, Polcom then procured Storage Endorsement 20 from AFM, which explicitly stated that the AFM Policy was extended to cover the Modules while they were stuck at the Port.  <u>See</u> AFM Policy, Endorsement No. 20.[9]

On or about October 1, 2018, transport of the Modules to the hotel began on a rolling basis and concluded on December 29, 2018. Polcom 56.1 ¶¶ 35-36.

Between the arrival of the Modules at the Port in August 2018 and delivery of the Modules to the Hotel on December 29, 2018, the Port received a substantial amount of rain.  <u>Id.</u> ¶ 40; Zurich 56.1 ¶ 18.  As a result, excess moisture was detected when the Modules first arrived and were being installed at the Hotel Site in October of 2018.  Polcom 56.1 ¶ 38.[10]

Mortenson thereafter notified Zurich of a potential moisture-related claim on October 29, 2018, <u>id.</u> ¶ 39; Zurich 56.1 ¶ 31, and Zurich and Polcom hired several moisture remediation specialists and consultants.  Zurich 56.1 ¶ 40; Mortenson 56.1 ¶ 14.  Polcom also notified AFM about the moisture-related issues, and AFM sent

---

Subcontract § 16.2 (emphasis added).

[9] Storage Endorsement 20 was executed September 5, 2018 but effective August 16, 2018.  Polcom 56.1 ¶ 33.

[10] It is undisputed that the Modules were also exposed to further elements, resulting in moisture damage at the Hotel Site.  <u>See</u> Polcom 56.1 ¶ 41; Zurich-Polcom 56.1 Counter Statement ¶ 41.

a marine surveyor to assess the Modules.  Zurich 56.1 ¶¶ 38–39.
AFM's surveyor observed the presence of water damage and mold
formation and ran various tests to determine the source of the
water damage.  Id. ¶ 39; ECF No. 117-15 Anania Decl. Ex. 15, Email
Dated Jan. 11, 2019.  Studies done by Zurich's and Polcom's
specialists also concluded that the Modules had been damaged at
the Port due to rain exposure.  Polcom 56.1 ¶ 40; Zurich-Polcom
56.1 Counter Statement ¶ 40.  Polcom alleges that Mortenson and
Polcom, in consultation with their experts, subsequently
determined that substantial demolition and rebuilding of the
Module interiors was necessary for remediation.  Polcom's First
Amended Complaint, ECF No. 36 ("Polcom AC") ¶ 45.  As a result,
the modules had to be stripped down to their studs and rebuilt.
Polcom 56.1 ¶ 43.

In total, between October 2018 and October 2020, Polcom
submitted claims to Zurich on a rolling basis totaling
$17,371,352.32 and Mortenson submitted claims totaling
$17,226,338.00.  Polcom 56.1 ¶ 44.  Polcom also submitted a claim
against AFM, which allegedly totaled $18,698,275.  See AC ¶ 43,
ECF No. 116 ("Zurich Br.") at 6.[11]

---

[11] Zurich asserts that there is "substantial[] overlap" between this claim and
Polcom's claim against Zurich.  See Zurich Br. at 6.

-14-

**VI.  AFM and Zurich Payments (or Lack Thereof)**

On November 5, 2019, over nine months after AFM sent a surveyor to assess the Modules, AFM sent Polcom's broker a letter completely denying coverage under the AFM Policy for the losses incurred due to the damage to the Modules.  AC ¶ 49.[12]

Initially, Zurich sent Mortenson a Reservation of Rights letter on February 21, 2019, which stated that its investigation was incomplete, and:

> Zurich's investigation and evaluation of the claim and all efforts taken in regard to determination of coverage are without waiver of any of the terms or conditions of the Policy.  Zurich continues to reserve all rights under the Policy, in equity, and at law, including the right to raise other terms, conditions, provisions, limitations, and exclusions that might apply to the claim.

Ertman Decl. Ex. 15, Zurich Reservation of Rights Letter dated February 21, 2019.

However, despite its reservation of rights, Zurich made payments in December 2019 and February 2020 totaling $15,235,811.33 as it assessed the parties' submissions.  Zurich 56.1 ¶ 36.  Specifically, Zurich paid $10,738,200.00 to Mortenson

---

[12] AFM asserted that it was entitled to deny the claim because: (1) Polcom failed to demonstrate physical loss or damage to the shipments during the insured transit; (2) stowage on deck during the ocean voyage precluded coverage for damage occurring during the ocean voyage; and (3) Polcom had provided late notice of its claims -- that is, after installation of the Modules began at the Hotel.  AC ¶ 50.

on Mortenson's initial claims and another $4,547,599.00 to Mortenson, which, according to Polcom, Zurich directed Mortenson to forward to Polcom as payment on Polcom's initial claims submissions to Zurich.  Id.; Polcom 56.1 ¶ 51.  To date, however, Mortenson has retained that payment.  Polcom 56.1 ¶ 51.

After February 2020, the Zurich review process was halted, and Zurich has not made any further payments on the outstanding portion of the $19.5 million claim.  Id. ¶ 53.  In March 2021, Zurich sent letters to both Polcom and Mortenson via outside counsel, which denied coverage to both Polcom and Mortenson for damage suffered by the Modules at the Port under the Zurich Policy. Id. ¶¶ 55-57.

## PROCEDURAL HISTORY

Polcom filed its original complaint on November 3, 2020 against AFM (the "Polcom Action"), bringing claims for breach of contract and breach of the implied covenant of good faith and fair dealing and alleging that AFM exhibited bad faith in rejecting any coverage obligation.  ECF No. 5 ("Polcom Compl.").  Among other things, Polcom asserted that AFM "was obligated to pay Polcom for the loss incurred with respect to the damage the modules sustained . . . on the interior of the modules during the period they were staged at Port Everett until their delivery to the Seattle Hotel Construction Site," because "any . . . loss" that is "due to damage

-16-

that occurred prior to the arrival of the [M]odules at the Port of Everett . . . [was] covered by the [AFM] Policy." Compl. ¶¶ 32, 49.[13]

On January 19, 2021, AFM filed a motion to dismiss on the bases that the action was untimely and that the breach of implied covenant claim was duplicative of the breach of contract claim. ECF No. 21. In a Memorandum and Order published on July 22, 2021, this Court granted in part and denied in part AFM's motion, agreeing with Polcom that its suit was not time-barred but dismissing its breach of implied covenant and fair dealing claim on the ground that it was duplicative of Polcom's breach of contract claim. See Polcom USA, LLC v. Affiliated FM Ins. Co., 551 F. Supp. 3d 290 (S.D.N.Y. 2021).

Two months later, on September 16, 2021, Polcom amended its complaint to add Zurich as a defendant. See AC.[14] On November 10, 2021, Zurich answered, denying liability and asserting: (i) a crossclaim against AFM for a proportionate share of liability in the event that it is determined to have any liability to Polcom; and (ii) a counterclaim against Polcom, seeking a declaration that Polcom was not covered by the Zurich Policy for any damage that

---

[13] Polcom did not mention Zurich once in its original complaint.

[14] Polcom alleged in the Amended Complaint that both AFM and Zurich were obligated to pay for damage to the Modules sustained at the Port and at the Hotel Site. See AC ¶¶ 87, 103.

occurred while the Modules were not at the hotel construction site and that, "[r]egardless of the outcome of whether and when Polcom is an Additional Insured under the Zurich Policy, Zurich is entitled to a declaration that the $4,547,599 payment made on behalf of Polcom to Mortenson is deemed paid to Polcom." ECF No. 44. AFM answered the crossclaim on December 1, 2021 and asserted a crossclaim against Zurich for Zurich's proportional share of liability in the event AFM is deemed to have any liability to Polcom. ECF No. 46.

Separately, on September 14, 2021, Mortenson brought suit in Washington state court against Zurich, (the "Mortenson Action"), which Zurich removed to the Western District of Washington on October 14, 2021, and then sought transfer to this Court on October 17, 2021. Dkt. 22-cv-0092, ECF Nos. 1, 5. That motion was granted on December 21, 2021, and the Mortenson Action was transferred to this Court and consolidated with the Polcom Action on January 21, 2022. Dkt. 22-cv-0092, ECF No. 21; ECF No. 53.[15]

On February 2, 2022, the Court held a conference, at which we directed the parties to "phase" the cases, i.e., to focus on certain legal issues that could be resolved before full discovery

---

[15] Zurich answered Mortenson's complaint on May 27, 2022 and brought a counterclaim against Mortenson for declaratory relief. See ECF No. 78. Mortenson answered Zurich's counterclaim on June 21, 2022. See ECF No. 81.

took place.  See ECF No. 61 (revised proposed scheduling order acknowledging the Court's proposal).

Thus, on September 9, 2022, the parties filed an amended scheduling order, which stated that the actions would proceed in two phases. ECF No. 92. In Phase I, the parties would move for summary judgment on the Zurich Policy Coverage Issue and the AFM-Zurich Coverage Issue.  Id.

On October 31, 2022, the parties filed their motions for partial summary judgment, associated declarations, memoranda, exhibits, 56.1 statements, and motions to seal.  See ECF Nos. 98-119; Dkt. 22-cv-0092, ECF Nos. 69-84.[16]   The parties then filed their oppositions and 56.1 counter statements (along with further declarations, exhibits, and motions to seal) on November 30, 2022, see ECF Nos. 123-48; Dkt. 22-cv-0092, ECF Nos. 87-109,[17] and filed reply briefs on December 19, 2022, ECF Nos. 150 ("AFM Reply"), 151 ("Mortenson Reply"), 152 ("Zurich Reply"), 155 ("Polcom Reply").

---

[16] Specifically, the parties' opening memoranda of law are filed at ECF Nos. 101 ("AFM Br."), 108 ("Polcom Br."), 116 ("Zurich Br."), and Dkt. No. 22-cv-0092, ECF No. 71 ("Mortenson Br.").

[17] AFM's, Mortenson's, and Polcom's memoranda in opposition are filed at ECF Nos. 123 ("AFM Opp."), 126 ("Mortenson Opp."), and 136 ("Polcom Opp."). Zurich filed three opposition memoranda -- one in response to each of AFM's, Mortenson's, and Polcom's opening briefs -- which are filed at ECF Nos. 145 ("Zurich-Polcom Opp."), 146 ("Zurich-Mortenson Opp."), and 147 ("Zurich-AFM Opp.").

**LEGAL STANDARDS**

## I.    Choice of Law

Before turning to the merits, we briefly address the parties' choice-of-law debate.  Polcom and Mortenson both argue that the Court should apply Washington state law but acknowledge that the outcome of this motion would be the same under Washington, Minnesota, or New York law.  See Polcom Br. at 9; Mortenson Opp. at 2 n.2.[18]  Zurich agrees that there is no need to reach a choice of law decision in this motion.  Zurich-Mortenson Opp. at 4-5.

"In diversity jurisdiction cases such as this, it is well settled that a federal court must look to the choice of law rules of the forum state."  Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998).  And "[i]n New York, . . . the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws."  Id. (internal citations omitted); accord Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A., 270 F. Supp. 3d 716, 724 (S.D.N.Y. 2017).

Here, we agree with the parties that the law applicable to the Zurich Policy Coverage Issue is the same for each of the potential states whose law might apply (Washington, Minnesota, and New York), and thus there is no actual conflict.  Notably, under

---

[18] Minnesota law is relevant because Mortenson is a Minnesota-based corporation. See Polcom 56.1 ¶ 2.

Washington, Minnesota, and New York law, a court interprets an insurance policy according to its plain meaning, giving effect to the parties' intent.  See, e.g., Kut Suen Lui v. Essex Ins. Co., 375 P.3d 596, 599 (Wash. 2016) ("When we interpret an insurance policy, we consider the insurance policy as a whole, giving the policy a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.") (internal quotation marks omitted); Eng'g & Const. Innovations, Inc. v. L.H. Bolduc Co., 825 N.W.2d 695, 704 (Minn. 2013) ("Our objective when interpreting insurance contracts is to ascertain and give effect to the intentions of the parties as reflected in the terms of the insuring contract.  Where the language of an insurance policy is clear and unambiguous, we effectuate the intent of the parties by interpreting the policy according to plain, ordinary sense.") (internal quotation marks, citations, and alterations omitted); Ment Bros. Iron Works Co. v. Interstate Fire & Cas. Co., 702 F.3d 118, 122 (2d Cir. 2012) ("The New York approach to the interpretation of contracts of insurance is to give effect to the intent of the parties as expressed in the clear language of the contract.") (quoting Mount Vernon Fire Ins. Co. v. Belize NY, Inc., 277 F.3d 232, 236 (2d Cir. 2002).

**II.  Summary Judgment and the Burden of Proof**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(a).  "A fact is material when it might affect the outcome of the suit under governing law," and "[a]n issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted).

On a motion for summary judgment, "[t]he moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact[,] [and] [w]here the moving party meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (internal quotation marks and citation omitted).  "The same standard . . . applies when," as in this case, "the court is faced with cross-motions for summary judgment.  Each party's motion must be reviewed on its own merits, and the Court must draw all reasonable inferences against the party whose motion is under consideration."  Bell v. Pham, No. 09-cv-1699 (PAC) (RLE), 2011 WL 1142857, at *2 (S.D.N.Y. Mar. 24, 2011) (citing Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001)).

-22-

The parties dispute whether plaintiffs Mortenson and Polcom or defendant Zurich bears the burden of proof on the Zurich Policy Coverage Issue.  Specifically, plaintiffs argue that, because the Zurich Policy is a so-called "all-risk" insurance policy, the losses at the Port "are presumptively covered by the insuring clause, and Zurich bears the burden of proving that the losses are excluded by a specific provision in the policy."  Mortenson Reply, at 3-4.  "All risk" insurance "is a promise to pay upon the fortuitous and extraneous happening of loss or damage from any cause whatsoever unless that cause is specifically excluded." Frank Coluccio Const. Co., Inc. v. King Cnty., 150 P.3d 1147, 1155 (Wash. Ct. App. 2007); see Mortenson Reply at 4.

Mortenson is broadly correct that the Zurich Policy is an "all risk" policy, but its argument that Zurich consequently bears the burden of proof is not supported by the case law.  Under New York law, it is a "'well-established principle' that a policyholder bears the initial burden of showing that the insurance contract covers the loss."  Roundabout Theatre Co. v. Cont'l Cas. Co., 302 A.D.2d 1, 6 (1st Dep't 2002); see also Crescent Beach Club LLC v. Indian Harbor Ins. Co., 468 F. Supp. 3d 515, 541 (E.D.N.Y. 2020) (noting that the insured has the "burden to establish the existence of coverage") (emphasis added).  By contrast, "the burden of proving that a coverage exclusion applies rests with the insurer."

-23-

See Crescent Beach Club LLC, 468 F. Supp. 3d at 541 (emphasis added); accord Channel Fabrics, Inc. v. Hartford Fire Ins. Co., No. 11-cv-3483 (JPO), 2012 WL 3283484, at *6 (S.D.N.Y. Aug. 13, 2012).[19]

It is worth noting the difference between coverage language generally and exclusions.  As the Supreme Court of Washington has stated: "[t]he coverage language defines the set of all claims that are covered.  The exclusions define subsets of claims that, although within the main set, are nevertheless excluded."  Queen City Farms, Inc., 126 Wash. 2d at 71-72 (quoting Thorsrud, Love & Gottlieb, at 604 n.168).

Here, although the Zurich Policy is an "all risk" policy, it limits the "set of all claims" to "Covered Property while at the location of the INSURED PROJECT, while in temporary offsite locations, and while in transit, all within the policy territory . . . ."  See Zurich Policy, at Section I – Coverages and Exclusions

---

[19] Washington law is in accord.  See Queen City Farms, Inc. v. Cent. Nat. Ins. Co. of Omaha, 126 Wash. 2d 50, 72 (1994), as amended (Sept. 29, 1994), as clarified on denial of reconsideration (Mar. 22, 1995) ("It is logical that the policyholder, as claimant, should bear the burden of proof of establishing that its claim is within the coverage of the policy, including that the property damage was caused by an occurrence, and that, once it has done so, the insurer should bear the burden of proof of establishing that the claim is within an exclusion.") (quoting Thorsrud, Love & Gottlieb, Insurance Coverage for Pollution Liability in Washington. What Constitutes an "Occurrence?" The Insurer's Perspective, 28 Gonzaga L. Rev. 579, 604 n.168 (1992-93)).  As is Minnesota law.   See SECURA Supreme Ins. Co. v. M.S.M., 755 N.W.2d 320, 323 (Minn. Ct. App. 2008) ("The insured bears the burden of demonstrating coverage under an insurance policy.  But if this burden is met, it is the insurer that must establish the applicability of exclusions.") (internal citation omitted).

§ 1(A) (emphasis added); <u>Queen City Farms, Inc.</u>, 126 Wash. 2d at 71-72.  These limitations are not exclusions, which are explicitly contained elsewhere within the Zurich Policy.  <u>See, e.g.</u>, <u>id.</u>, Coverage and Exclusions §§ 3-4 (subsections defining "Property Excluded" and "Exclusions").

Accordingly, Mortenson and Polcom bear the burden of proving that coverage exists, and we turn to the merits.[20]

### DISCUSSION

In order to resolve the parties' cross-motions for summary judgment, the Court must decide first whether the Zurich Policy covers the damage incurred by the Modules at the Port.  We begin by articulating certain governing principles of insurance contract interpretation.

---

[20] We also note that, contrary to Mortenson's arguments, "[l]abeling the [Zurich] [P]olicy as 'all-risk' does not relieve the insured of its initial burden of demonstrating a covered loss under the terms of the policy." <u>Roundabout Theatre Co.</u>, 302 A.D.2d at 6.  Mortenson contends that the Court should ignore <u>Queen City Farms</u> and <u>Roundabout Theatre</u> because those cases did not involve a "<u>builder's</u> all-risk policy such as the Policy at issue here." <u>See</u> Mortenson Reply Br. at 4-5 (emphasis added).  We disagree.  Although there are factual differences between those cases and the instant action, the case law is clear that, under <u>any</u> "all-risk" policy, the insured must prove that its loss is covered under the terms of the policy.  <u>See</u> <u>U.S. Dredging Corp. v. Lexington Ins. Co.</u>, 99 A.D.3d 695, 696 (2d Dep't 2012).  Regardless, there is recent case law from both Judge Seibel of this District and the Supreme Court of Washington interpreting a builder's "all-risk" policy and stating that the insured has the initial burden to show that the loss falls within the scope of the policy's coverage.  <u>See</u> <u>232 Dune Rd., LLC v. Scottsdale Ins. Co.</u>, No. 20-cv-7721 (CS), 2023 WL 1967501, at *11 (S.D.N.Y. Feb. 13, 2023); <u>Seattle Tunnel Partners v. Great Lakes Reinsurance (UK) PLC</u>, 200 Wash. 2d 315, 321 (2022).

I.   **Principles of Insurance Contract Interpretation**

"[I]nterpretation of an insurance agreement is a question of law," High Point Design, LLC v. LM Ins. Corp., 911 F.3d 89, 93 (2d Cir. 2018) (internal quotation marks omitted), as is "the question of whether an insurance policy is ambiguous," Hugo Boss Fashions, Inc. v. Fed. Ins. Co., 252 F.3d 608, 616 (2d Cir. 2001) (internal quotation marks and alterations omitted).  Insurance policies are interpreted according to principles of contract law, see Petroterminal De Panama v. Houston Cas. Co., 659 F. App'x 46, 49 (2d Cir. 2016), pursuant to which we "must interpret the contract to give effect to the intent of the parties as expressed in the clear language of the contract," Intelligent Digital Sys., LLC v. Beazley Ins. Co., 716 F. App'x 1, 3 (2d Cir. 2017) (summary order) (internal quotation marks omitted).

"In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous." Great Minds v. FedEx Office & Print Servs., Inc., 886 F.3d 91, 94 (2d Cir. 2018) (quoting Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011)).  In making its determination with respect to ambiguity, the Court "always . . . begin[s] with the terms of the contract itself to see if the intent of the parties can be gleaned without resort to extrinsic evidence." Hugo Boss Fashions, Inc., 252 F.3d at 617.  In construing the terms of the agreement,

-26-

"the words and phrases [in a contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." Olin Corp. v. American Home Assur. Co., 704 F.3d 89, 98-99 (2d Cir. 2012) (internal quotation marks omitted) (alteration in original). "If the court finds that the contract is not ambiguous . . . without the aid of extrinsic evidence, it may then award summary judgment." Int'l Multifoods Corp. v. Com. Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002) (internal quotation marks and alterations omitted).

"Contract language is not ambiguous if it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989) (internal quotation marks and alterations omitted). "[A]mbiguity does not exist 'simply because the parties urge different interpretations,'" Hugo Boss Fashions, Inc., 252 F.3d at 616 (quoting Seiden Assocs. Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992)), and "a mere assertion by one of the parties that a clause is ambiguous would not prevent summary judgment." Garza v. Marine Transp. Lines, Inc., 861 F.2d 23, 27 (2d Cir. 1988) (internal quotation marks omitted). Rather, "the language of a contract is ambiguous if it is capable of more than one meaning

when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." <u>Lockheed Martin Corp.</u>, 639 F.3d at 69.

With these principles in mind, we turn to the merits of the Zurich Policy Coverage Issue.

## I.   The Zurich Policy Does Not Cover the Damage Incurred to the Modules at the Port

As discussed <u>supra</u>, the Court engages in a tripartite analysis to determine whether, while the Modules were at the Port: (a) Polcom constituted an "Additional Insured" (the "who"); (b) the Modules were "Covered Property" (the "what"); and (c) the Port fits into any of the Extension of Coverage provisions (the "where").  Each step leads us to the same conclusion: namely, that the Zurich Policy did not provide coverage for Polcom and Mortenson while the Modules were stuck at the Port.

We first address whether Polcom falls within the definition of an "Additional Insured" under the Zurich Policy.

### a. Polcom Was Not an "Additional Insured" at the Port

Although Mortenson is clearly a named insured under the Zurich Policy, <u>see</u> Zurich Policy, Policy Declarations § 3(A), Polcom must establish that it was an "Additional Insured" while the Modules were stationed at the Port, <u>see</u> <u>id.</u> § 3(B).  As noted earlier, "Additional Insured" is defined as follows:

> All owners, all contractors and all subcontractors of
> every tier, and tenants at the project location,
> architects and engineers . . . as required by any
> contract, subcontract or oral agreement for the INSURED
> PROJECT, including any other entity as required by the
> Named Insured, and then only as their respective
> interests may appear are recognized as Additional
> Insureds hereunder. <u>As respects manufacturers and
> suppliers, their interest is limited to their site
> activities only</u>.

<u>Id.</u> (emphasis added). Zurich agrees that "Polcom's additional
insured status [at the Hotel Site] is not in question." Zurich-
Polcom Opp. at 14. However, it contends that Polcom is not covered
for offsite activities because it was a "manufacturer or supplier"
of the Modules. Polcom responds that, per the terms of the
Subcontract, it was not a "manufacturer or supplier," but rather
qualifies only as a "subcontractor" under the Additional Insured
clause. <u>See, e.g.,</u> Polcom Opp. at 2-4. We reject Polcom's
position, finding it foreclosed by the plain language of the Zurich
Policy and the overall purpose of the parties' agreements.

Starting with the text, although the term "manufacturers and
suppliers" is not defined within the Zurich Policy, Polcom clearly
qualifies under the term's plain and ordinary meaning. <u>See</u> <u>Lepore
v. Hartford Fire Ins. Co.</u>, 800 F. App'x 29, 31 (2d Cir. 2020)
(summary order) ("The clear and explicit meaning of insurance
policy provisions, interpreted in their ordinary and popular
sense, controls judicial interpretation unless used by the parties

in a technical sense or a special meaning is given to them by usage.") (alteration omitted); <u>Moeller v. Farmers Ins. Co. of Wash.</u>, 173 Wash. 2d 264, 272 (Wash. 2011) ("Undefined terms in an insurance policy are given their ordinary and common meaning, not their legal, technical meaning."); <u>see also</u> <u>Hugo Boss Fashions, Inc.</u>, 252 F.3d at 617 ("[T]he fact that the language of the contract itself does not specify the meaning of a disputed term does not entail that an ambiguity . . . exists.").

Black's Law Dictionary defines "manufacturer" as "[a] person or entity engaged in producing or assembling new products," and "supplier" as "1. A person or business engaged, directly or indirectly, in making a product available to consumers[; or] 2. Someone who gives possession of a chattel for another's use or allows someone else to use or occupy it while it is in the person's possession or control." <u>Manufacturer</u>, <u>Black's Law Dictionary</u> (11th ed. 2019); <u>Supplier</u>, <u>Black's Law Dictionary</u> (11th ed. 2019).[21] Polcom is undoubtedly a manufacturer because it built and assembled the Modules, a fact which it cannot -- and does not --

---

[21] Under all relevant jurisdictions, courts look to dictionary definitions to determine the plain and ordinary meaning of words in a contract. <u>See Fed. Ins. Co. v. Am. Home Assur. Co.</u>, 639 F.3d 557, 567 (2d Cir. 2011); <u>Boeing Co. v. Aetna Cas. & Sur. Co.</u>, 113 Wash. 2d 869, 877-78 (Wash. 1990); <u>Larson v. Nw. Mut. Life Ins. Co.</u>, 855 N.W.2d 293, 301 (Minn. 2014).

dispute.  <u>See, e.g.</u>, Polcom Opp. at 15 ("Polcom was the manufacturer of the Modules . . . .").[22]

In addition, contrary to Polcom's preferred interpretation, a plain reading of the Additional Insured clause does not turn on Polcom's status as a subcontractor.  To be sure, the first sentence of the provision expressly classifies subcontractors (among other entity types) as "Additional Insureds," and it cannot be disputed that Polcom was a subcontractor.  <u>See, e.g.</u>, Zurich Br. at 2 ("Mortenson subcontracted with [Polcom] to manufacture and supply the pods, and to deliver them to the Jobsite . . . ."); <u>id.</u> at 16 ("Polcom . . . qualifie[d] as an [Additional Insured] for at least some purposes.").  However, the two sentences of the Additional Insured clause, when read together (as they must be),[23] dictate

---

[22] Indeed, any argument with respect to the instant motions that Polcom is not a "manufacturer" of the Modules would directly contradict Polcom's complaint and other of its submissions in this action.  <u>See, e.g.</u>, ECF No. 36, Polcom's First Amended Complaint ("AC") ¶ 1 ("In 2018, Polcom <u>manufactured</u> and shipped hotel-room modules from Poland to Seattle, Washington . . . . Polcom specializes in the <u>manufacture</u> . . . of fully furnished hotel-room modules. . . .") (emphasis added); ECF No. 108-1, Declaration of Michael S. Smith, Esq. ¶ 14 ("The Subcontract also set out detailed, highly specific specifications for the Modules, such that Polcom had to <u>manufacture</u> them custom to Mortenson's requirements.  In other words, Polcom did not supply the Modules "off the shelf," but provided custom hotel room units designed and <u>manufactured</u> to Mortenson's specifications.") (emphasis added).

[23] "[L]anguage [in a contract] must be read in context."  <u>Charter Oak Fire Ins. Co. v. Zurich Am. Ins. Co.</u>, 462 F. Supp. 3d 317, 329 (S.D.N.Y. 2020); <u>see also Mon Chong Loong Trading Corp. v. Travelers Excess & Surplus Lines Co.</u>, No. 12-cv-6509 (CM), 2013 WL 3326662, at *5-*6 (S.D.N.Y. June 27, 2013) (multiple sentences in a single provision should not be read "in isolation" and must be read as a whole); <u>Queen City Farms, Inc.</u>, 126 Wash. 2d at 74 (examining provision "in context, that is, in light of th[e] primary policies' language as a whole"); <u>Com. Bank v. W. Bend Mut. Ins. Co.</u>, 870 N.W.2d 770, 773 (Minn. 2015) ("Provisions in a policy must be read in context with all other relevant provisions.").

that coverage for <u>any</u> manufacturers or suppliers -- even if those entities are also subcontractors -- is limited to "site activities only."[24]   Polcom's argument that it was more than a "mere manufacturer or supplier" with respect to the citizenM hotel project is therefore irrelevant, as is the fact that Polcom was obligated to perform additional work after delivery to the Hotel Site. <u>See</u> Polcom Opp. at 3.[25]   As Zurich correctly notes, "[a]ny

---

[24] We also note that the first sentence expressly includes the phrase "at the project location," Zurich Policy, Policy Declarations § 3(B), and can be read to limit subcontractors' status as additional insured to site activities. However, we do not rely alone on this reading, because the "project location limitation" can alternatively be read as only applicable to "tenants."

[25] For this reason, Polcom's reliance on a Sixth Circuit case, <u>Mosser Construction, Inc. v. Travelers Indemnity Co.</u>, 430 F. App'x 417 (6th Cir. 2011), is misplaced. Polcom argues that, under <u>Mosser</u>, "if an entity (a) supplies custom, as opposed to off-the-shelf, materials; (b) performs part of the site construction work the general contractor contracted to perform; or (c) performs pursuant to an agreement incorporating the terms and conditions of the owner/general contractor agreement, it is a subcontractor," and "[i]f it does not 'do these things, then it is a mere supplier." Polcom Opp. Br. at 16-17. We do not read that case so broadly as to encompass the facts presented in our action. Rather, <u>Mosser</u> surveys case law nationwide and holds that manufacturers and suppliers can generally be subcontractors when the term "subcontractor" is undefined and outlines the circumstances under which "a material supplier who does not perform work at the site [can] be a subcontractor." <u>Mosser</u>, 430 F. App'x at 421-25. However, <u>Mosser</u> does not grapple with a "site activities only" limitation applicable to manufacturers and suppliers like Polcom under the Zurich Policy and does not hold that, in the face of such an explicit limitation, courts should consider a manufacturer and supplier to be a subcontractor. Nor, in the Court's view, does the reasoning in <u>Mosser</u> prevent a party from being a manufacturer/supplier for some purposes <u>and</u> a subcontractor for others depending on the particular circumstances of the agreement(s) at issue.

Likewise, <u>Beazley Insurance Co., Inc. v. Eaton Corp.</u>, No. 16-cv-1255 (OLG), 2017 WL 9362564 (W.D. Tex. Nov. 17, 2017), is not applicable here. There, a supplier qualified as an additional insured under a clause which mimicked, in sum and substance, the <u>first sentence</u> of the Zurich Policy's Additional Insured clause. <u>See</u> <u>id.</u> at *3 ("All owners, all contracts and subcontractors of every tier, except as listed as Named Insured in 1.a. above, as required by any contract for the Insured Project, and then only as far as their respective interest may appear, are recognized as Additional Insureds under this Policy."). However, the policy at issue in <u>Beazley</u> did not contain

other reading would render the limitation meaningless given that all manufacturers and suppliers who supply goods or materials to a construction project do so pursuant to some type of contract and can thus be labeled 'subcontractors.'"  Zurich Br. at 23.

Our interpretation aligns with the specific arrangement between Polcom, Mortenson, and AFM as expressed in the Subcontract and AFM Policy.  Notably: (i) the Subcontract required Polcom to obtain transit and storage insurance that covered "all shipments of the equipment from the time the equipment (or components thereof) leave the manufacturing facility while being transported over land and sea, until such shipments reach the Project site," Subcontract § 16.2 (emphasis added); (ii) Polcom maintained such coverage from AFM, see Polcom 56.1 ¶ 21; (iii) Polcom thereafter procured an additional endorsement from AFM while the Modules were stuck at the Port making explicit that the AFM Policy provided coverage while the Modules were staged at the Port, subject to the terms of earlier Endorsement 17, see Polcom 56.1 ¶ 32; and (iv) Polcom did not similarly attempt to modify the Zurich Policy to extend Zurich's coverage to offsite activities, or confirm that such coverage existed.[26]    Polcom's interpretation would thus

the "site activities only" limitation for manufacturers and suppliers and thus does not govern how the Additional Insured provision should be interpreted here.

[26] The Court may consider the surrounding circumstances underlying the contract to determine the parties' apparent purpose prior to finding any ambiguity in the contract, and doing so does not constitute reliance on extrinsic evidence.

-33-

effectively ask the Court to rewrite the Zurich Policy after the fact to effectuate coverage where none was contemplated.  See Atlas Partners, LLC v. STMicroelectronics, Int'l N.V., No. 14-cv-7134 (VM), 2015 WL 4940126, at *5 (S.D.N.Y. Aug. 10, 2015) ("[A] contract should not be interpreted to produce a result that is . . . commercially unreasonable or contrary to the reasonable expectations of the parties.") (quoting Greenwich Cap. Fin. Prods., Inc. v. Negrin, 74 A.D.3d 413, 415 (1st Dep't 2010)).[27]

Last, our reading of the Additional Insured clause is consistent with the purpose of builder's risk insurance generally. See AGCS Marine Ins. Co. v. World Fuel Servs., Inc., 187 F. Supp. 3d 428, 453 (S.D.N.Y. 2016) (interpreting term in insurance contract in context of "the Policy's evident purpose"); ABM Mgmt.

---

See Berg v. Hudesman, 115 Wash. 2d 657, 669 (1990) ("We thus reject the theory that ambiguity in the meaning of contract language must exist before evidence of the surrounding circumstances is admissible.  Cases to the contrary are overruled."); Kurtin v. Nat'l R.R. Passenger Corp. (Amtrak), 887 F. Supp. 676, 679 (S.D.N.Y. 1995) (noting that the Court must give "due consideration to the surrounding circumstances [and] apparent purpose which the parties seek to accomplish") (internal quotation marks omitted).  Here, the above-referenced facts, which are clear and undisputed, place Polcom's responsibilities and insurance obligations into their appropriate context.

Moreover, because the Court holds that the Additional Insured provision is not ambiguous, it need not consider the parties' communications and conduct, either before or after the claims process.  See Kass v. Kass, 91 N.Y.2d 554, 568 (N.Y. 1998) (noting that "extrinsic evidence cannot create an ambiguity in an agreement") (emphasis in original).

[27] The Court also finds it relevant that Polcom only commenced this action against AFM, did not mention Zurich or the Zurich Policy once in its original complaint, and in contradiction to its allegations in its Amended Complaint, specifically stated in its original complaint that the AFM Policy (not any other policy) covered all losses at the Port, and such coverage applied until "arrival of the [M]odules at the [Hotel Site]."  See Compl. ¶ 21.

-34-

Corp. v. Harleysville Worcester Ins. Co., 112 A.D.3d 763, 765 (2d
Dep't 2013) (contractual provisions must be "[r]ead together, and
in light of the reasonable expectations of a businessperson")
(internal quotation marks omitted); Republic Nat. Life Ins. Co. v.
Lorraine Realty Corp., 279 N.W.2d 349, 354 (Minn. 1979) ("Intent
is ascertained, not by a process of dissection in which words or
phrases are isolated from their context, but rather from a process
of synthesis in which the words and phrases are given a meaning in
accordance with the obvious purpose of the contract as a whole.")
(internal quotation marks omitted).  We agree with Zurich that
"builder's risk policies are designed to cover damage to buildings
under construction and the associated equipment and tools used to
construct those buildings," and such policies are "not issued to
become a substitute for the additional insured's own property away
from the construction site."  Zurich-Polcom Opp. at 7.  Here, the
Additional Insured clause "recognizes that it is common for
manufacturers and suppliers of construction products to store
those products at the construction site prior to their being
installed and prior to title to the materials transferring to the
owner or the general contractor," which is why such manufacturers
or suppliers are covered "if their property is damaged while onsite
awaiting installation," id. at 4, but not necessarily if damaged
offsite.

Accordingly, Polcom was not an "Additional Insured" while the Modules were stored at the Port, which precludes it from coverage under the Zurich Policy for such damage.  The Court next evaluates whether, under the Zurich Policy, the Modules were "Covered Property" while they were at the Port and whether the Port was a covered location.

### b. The Modules Were Not "Covered Property" While at the Port

As noted supra, the Zurich Policy specifies that "Covered Property" means the "Insured's interest in," inter alia, "Property Under Construction," which is defined in relevant part as "[a]ll property, . . . being property of the Insured or of others for which the Insured may have assumed responsibility and is intended to become a permanent part of the INSURED PROJECT . . . ."  Zurich Policy, Coverages and Exclusions § 2; id., Definitions and Examples § 18.  Thus, in order for Mortenson to be entitled to coverage, the Modules must have been either: (i) "property of [Mortenson]" or (ii) property of another "for which [Mortenson] may have assumed responsibility" when they were stationed at the Port.  See id.

Zurich does not dispute that the Modules were "Covered Property" while at the Hotel Site, but contends that –– consistent with the plain language of the Zurich Policy and Polcom's responsibilities as outlined in the Subcontract –– the Modules were not "Covered Property" before they reached the Hotel Site.

-36-

See Zurich Br. at 10-19.  Mortenson, by contrast, raises two
overarching arguments: first, it writes that "Zurich's admission
that the pods were 'Covered Property' at the Jobsite is fatal to
its recent attempts to decline coverage for damages at the Port."
Mortenson Opp. at 10-11.  Second, it adds that, in any event,
Mortenson had a material, insurable interest in the Modules as
soon as they entered the United States.  See id. at 11-13.

Both of Mortenson's arguments are fatally flawed.  At the
outset, the Zurich Policy necessarily contemplates that property
can be "Covered" at one location but not at another through the
limiting conditions that Mortenson must either own such property
or have assumed responsibility for it.  In other words, even if
the Modules were "Covered Property" at the Hotel Site, it does not
follow that it also must have been so at the Port.

Likewise, an insurable interest -- i.e., a "lawful and
substantial economic interest in the safety or preservation of
property from loss, destruction or pecuniary damage," N.Y. Ins.
Law § 3401 -- is a necessary, but not sufficient condition to
confer coverage where such coverage is expressly limited by certain
parameters outlined in the applicable policy.  See United States
v. Am. Home Assurance Co., No. 94-cv-7621 (LMM), 2003 WL 21436219,
at *7 (S.D.N.Y. June 19, 2003) (noting that the "possession of an
insurable interest alone . . . entitles the possessor to nothing,"

-37-

and the Court must look "to the terms of the policy to determine who is covered and the extent of coverage") (internal quotation marks omitted).  Under the Zurich Policy, property must meet, <u>inter alia</u>, the ownership or assumption of responsibility conditions outlined in the definition of "Property Under Construction."  Thus, the "Covered Property" and "Property Under Construction" provisions also refute Mortenson's argument that the Modules were covered at the Port because it had an "undeniable" interest in the Modules upon entering United States territory.  <u>See</u> Mortenson Br. at 13.  !

Next, the plain language of the Zurich Policy demonstrates that Mortenson did not own the Modules or have responsibility for them while they were stationed at the Port.  With respect to ownership, it cannot be disputed that the Modules were not Mortenson's property while they sat at the Port: per the terms of the Subcontract, title to the Modules passed directly from Polcom to citizenM.  Subcontract § 7.5.[28]

Mortenson also did not "assume responsibility" for the Modules while they were at the Port.  The term "assume responsibility" is not explicitly defined in the Zurich Policy,

---

[28] The Subcontract states: "Subcontractor warrants and guarantees that title to all Work, materials and equipment included in an application for payment, whether incorporated into the Project or not, will pass to [citizenM] upon receipt of such payment by Subcontractor, free and clear of all liens, claims, security interests or encumbrances."  <u>Id.</u>

-38-

but "assume" can be defined as "[t]he act of taking (esp. someone else's debt or other obligation) for or on oneself; [or] the agreement to so take," and "responsibility" means "[t]he quality, state, or condition of being duty-bound, answerable, or accountable."  <u>Assumption</u>, <u>Black's Law Dictionary</u> (11th ed. 2019); <u>Responsibility</u>, <u>Black's Law Dictionary</u> (11th ed. 2019).  Mortenson offers no proof that it "took, or had an agreement to take," a position in which it was "duty-bound, answerable, or accountable" for the Modules while they sat at the Port.  Rather, as Zurich correctly argues, the operative agreements between the parties -- particularly the Subcontract -- demonstrate that "Mortenson's assumption of responsibility began when the [Modules] arrived at the [Hotel Site,] but not before."  Zurich Br. at 1.

Indeed, language in the Subcontract states that "[d]elivery [of the Modules] shall be DDP Project site with all transportation, freight and delivery charges, insurance and taxes paid."  Subcontract § 6.1.  Under a DDP provision, "[t]he seller bears all the costs and risks involved in bringing the goods to the place of destination," <u>Tian Long Fashion Co. v. Fashion Ave. Sweater Knits, LLC</u>, No. 13-cv-8258 (RWS), 2016 WL 4097801, at *3 (S.D.N.Y. July 25, 2016).  Further, "[t]he seller must arrange and pay for transportation to the destination point, <u>and any necessary insurance</u>," 1 <u>Int'l Business Transactions</u>, The Delivery Duty Paid

-39-

(DDP) Term § 2:20 (3d ed. 2022) (emphasis added).  <u>See also</u> <u>id.</u>
("The risk of loss is upon the seller until the goods arrive at
the designated destination point . . . .").

Because the term DDP has an "established definition provided
by . . . industry usage," that definition "will . . . control
unless the parties explicitly indicate, on the face of their
agreement, that the term is to have some other meaning."  <u>Hugo</u>
<u>Boss Fashions, Inc.</u>, 252 F.3d at 617-18.[29]  Here, not only do the
parties fail to "explicitly indicate" in either the Zurich Policy
or the Subcontract that the term "DDP" should have had "some other
meaning," but other key provisions in the Subcontract are also
wholly consistent with the DDP provision.  As previously discussed,
Polcom was responsible for: (i) arranging and paying for
"[t]ransportation to [the] Seattle Port" and "all transportation
to <u>the project site from the Port of Seattle</u>," Subcontract §§
2(v)(2), (9) (emphasis added); (ii) "ensur[ing] all modular units
[were] covered, secured[,] and protected from damage <u>during the</u>
<u>shipping process</u>," <u>id.</u> § 2(v)(2) (emphasis added); (iii) obtaining

---

[29] The Uniform Commercial Code is in accord that where, as here, "the contract
requires or authorizes the seller to ship the goods by carrier" to a particular
destination, the risk of loss passes to the buyer "when the goods are there
duly so tendered as to enable the buyer to take delivery."  U.C.C. § 2-509(1)(b)
(Am. L. Inst. & Unif. L. Comm'n 1977); N.Y. U.C.C. Law § 2-509(1)(b); Minn.
Stat. Ann. § 336.2-509(1)(b); <u>see also</u> <u>Galbraith v. Am. Motorhome Corp.</u>, 545
P.2d 561, 564 (Wash. Ct. App. 1976) (relying on § 2-509(1)(b) to assign risk of
loss to seller).

"[cargo insurance] covering all shipments of the equipment from the time the equipment (or components thereof) leave the manufacturing facility while being transported over land and sea, until such shipments reach the Project site," id. § 16.2 (emphasis added); and (iv) if "staging [was] required prior to delivery to the site[,] . . . coordinat[ing] and cover[ing] all costs that might be associated with the staging of the modular units," id. § 2(v)(9).

The Court therefore holds that "the parties' intent[,] as manifested by the contract as a whole," is clear: Polcom was responsible for protecting and insuring the pods while they were stored at the Port, which Polcom effectuated via the AFM Policy, and to which was added a specific endorsement to cover water damage to the Modules while they were stored at the Port. See Crescent Beach Club LLC, 468 F. Supp. 3d at 542 (quoting Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc., 716 F.3d 302, 313 (2d Cir. 2013)).[30]

---

[30] Because the aforementioned reasons are sufficient to demonstrate that Mortenson did not "assume responsibility" for the Modules while they were at the Port, the Court need not address Zurich's argument that the term "property of others for which the Insured may have assumed responsibility" refers to a "bailment" situation, and Mortenson was not a bailee of the pods while at the Port or at any time prior to delivery at the Hotel Site. See, e.g., Zurich Br. at 11-12.

### c. The Zurich Policy's Extensions of Coverage Subsection Cannot Save Polcom and Mortenson

Last, Mortenson argues that "if the [Zurich] Policy covers loss or damage, such as 'Water Damage,' to the pods at the Jobsite—as Zurich admits it does—then the Policy expressly <u>extends that coverage</u> to any loss or damage that occurs to the pods from the point at which the pods enter the United States until they arrive at the INSURED PROJECT, including while they are stored temporarily offsite."  Mortenson Opp. at 10-11 (emphasis in original).  This claim is also foreclosed by the Zurich Policy's plain language.

Mortenson's argument hinges on the following provision: "[i]f the property is in <u>transit</u> by a vessel that originated outside of the coverage territory . . . then the coverage commences when the property has been fully discharged from the vessel onto a point within the coverage territory."  Zurich Policy, Policy Declarations § 5(C) (emphasis added).[31]  In turn, the "transit" extension provides that:

> Coverage applies with respect to <u>Covered Property</u> from the commencement of loading at the original point of shipment anywhere within the Coverage Territory until arrival at the Insured Project or at a temporary offsite location, including shipments on inland or coastal waters but excluding ocean marine shipments.  To the extent others are responsible for loss or damage to <u>Covered Property</u> while in transit under terms FOB to a

---

[31] The "coverage territory" comprises "The United States of America."  <u>Id.</u> at Policy Declarations § 5(A)(1).

designated location or recipient, Company shall retain
the right to subrogate.

Id., Coverage and Exclusions § 5(A) (emphasis added). Zurich
correctly notes that "this extended coverage has the same
definitional limitations as the main property coverage" -- i.e.,
the extension only applies if the property at issue is "Covered
Property." See Zurich-Mortenson Opp. at 13. As discussed supra,
the Modules were not "Covered Property" at the Port, so the
"transit" extension is inapplicable.

Mortenson also contends that Zurich's interpretation is
inconsistent with the second sentence in the above-quoted transit
coverage provision, which extends Zurich's right of subrogation to
shipments sent "F.O.B."  See Mortenson Opp. at 15.[32]  Mortenson
claims that, "if another party (such as Polcom) agrees to assume
certain responsibilities and risks of loss for Covered Property
while the property is in transit, the result under the Policy is
not to void coverage."  Mortenson Opp. at 15 (emphasis in
original).  Rather, "unless coverage is otherwise precluded, the
existence of shipping terms such as F.O.B. (or DDP) only allow
Zurich to . . . pay for the damages covered under its Policy and

---

[32] "F.O.B. or Free on Board means that title to the property passes from the
seller to buyer at the designated FOB point."  David J. Joseph Co. v. M/V
BALTIC, 64 F. App'x 259, 263 (2d Cir. 2003), as amended (May 30, 2003) (quoting
Berisford Metals Corp. v. S/S Salvador, 779 F.2d 841, 843 n.2 (2d Cir. 1985)).

-43-

then seek reimbursement from another potentially responsible insurer that also covered shipping of the property at issue." Id. However, Mortenson's interpretation of the second sentence suffers from the same fundamental problem as its argument with respect to the first: namely, that coverage must be established by meeting the requirements of the Covered Property (and Property Under Construction) definitions, and Mortenson cannot make such a showing. Indeed, "[a] subrogation clause comes into play only after coverage is established; it does not itself create coverage." Zurich Reply at 6.[33]

Accordingly, Polcom and Mortenson cannot meet their burden to establish coverage.

## II. There is No Allocation of Damage at the Port between Zurich and AFM

Because the Zurich Policy does not extend coverage to either plaintiff for damage to the Modules suffered at the Port, there is

---

[33] For the same reasons, the Zurich Policy's definition of "Temporary Offsite Locations" coverage extension cannot save Mortenson. That provision states:

> Coverage applies to Covered Property while at any location on a temporary basis anywhere within the Coverage Territory, except while in the course of manufacturing or processing at a manufacturer's or supplier's site or while in transit. To the extent others are responsible for loss or damage to Covered Property while at an offsite location, Company shall retain the right to subrogate.

Zurich Policy, Coverage and Exclusions § 5(B) (emphasis added). Again, this definition turns on whether the Modules were "Covered Property," which they were not at the Port.

no allocation of responsibility necessary for such damage between AFM and Zurich.  Zurich's partial summary judgment motions with respect to the AFM-Zurich Coverage Issue therefore must be denied as moot, and AFM's partial summary judgment motion is denied.

### III. AFM's Motion to Dismiss Zurich's Crossclaims Is Denied

Last, we briefly address AFM's additional motion for partial summary judgment, which seeks dismissal of Zurich's crossclaim against AFM for indemnity and/or contribution.  See AFM Br. at 12–14.

AFM asserts that "[t]he substance of Zurich's cross claim[s] against AFM . . . is risibly vague," and argues that the crossclaim must be dismissed because: (1) AFM owes no contractual duties to Zurich; and (2) Zurich cannot recover under principles of equitable contribution and subrogation.  See id.[34]  Zurich –– as it must ––

---

[34] Zurich's crossclaim reads as follows:

> The Amended Complaint in this action seeks, among other things, liability against Zurich for alleged breach of contract and a declaration that there is coverage under the Zurich Policy for all of Polcom's claims.
>
> Zurich denies that it is liable to Polcom for the claims set forth in the Amended Complaint.
>
> However, in the event Zurich is determined to have any liability to Polcom for the claims set forth in the Amended Complaint, then AFM is liable to Zurich for AFM's proportionate share of that liability due to its own contractual, equitable, or other obligations, duties, liability and/or wrongdoing, including its proportionate share of liability for the $4,547,599 payment.

ECF No. 44 ¶¶ 136–38.

agrees that it was never in contractual privity with AFM, but counters that equitable principles preclude dismissal of its crossclaim.  See Zurich-AFM Opp. at 20-23.  We agree with Zurich that its crossclaim may proceed under an equitable contribution theory.

"Contribution rights, if any, between two or more insurance companies insuring the same event are not based on the law of contracts.  This follows from basic common sense because the contracts entered into are formed between the insurer and the insured, not between two insurance companies."  Maryland Cas. Co. v. W.R. Grace & Co., 218 F.3d 204, 210 (2d Cir. 2000).  Instead, such claims stem from equitable principles, and "[t]he controlling inquiry under an equitable analysis is whether one party is unjustly enriched at the expense of another."  Id. at 212.  "The notion of unjust enrichment applies . . . where the party sought to be charged for contribution[] has money which it should not retain, but should under equitable principles turn over to another."  Id.  A moving party must therefore show that: (1) one party was enriched; and (2) such enrichment was unjust.  Id.

It would be premature to hold that AFM is entitled to dismissal of Zurich's crossclaim as a matter of law, because there is a set of facts under which Zurich may be able to recover from AFM under an unjust enrichment theory.  Zurich alleges that it

paid approximately $4.5 million towards Polcom's claim to Mortenson, an amount which may exceed what it actually owes Polcom for damages sustained at the Hotel Site -- the only damages that Polcom is entitled to receive from Zurich.  It therefore remains possible that Zurich has, in fact, paid money for Polcom that AFM should have paid, and AFM must consequently reimburse Zurich for that excess payment.[35]  Such a scenario is sufficient to foreclose dismissal of Zurich's crossclaim at this time.[36]

## CONCLUSION

For the foregoing reasons, Polcom's and Mortenson's motions for partial summary judgment, ECF No. 103; Dkt. 22-cv-0092, ECF No. 70, are denied.  Zurich's motion for partial summary judgment against Polcom and Mortenson, ECF No. 112, is granted.  Zurich's motion against AFM with respect to whether its coverage was excess to AFM's coverage is denied as moot, and AFM's motion for partial summary judgment on the issue of whether it is exclusively an excess insurer, ECF No. 98, is denied.  AFM's motion for summary

---

[35] As noted supra, Mortenson has retained that payment, so Zurich may ultimately be entitled to reimbursement from Mortenson (and not AFM).

[36] We note, however, that Zurich's claim cannot proceed on an equitable subrogation theory, which the Second Circuit (and other courts in this District) have held are inapplicable between co-insurers as a matter of law.  See, e.g., Md. Cas. Co., 218 F.3d at 211; Danaher Corp. v. Travelers Indem. Co., No. 10-cv-121 (JPO), 2014 WL 1133472, at *7 (S.D.N.Y. Mar. 21, 2014); Nat'l Cas. Co. v. Vigilant Ins. Co., 466 F. Supp. 2d 533, 541–42 (S.D.N.Y. 2006); Tech. Ins. Co., Inc. v. Philadelphia Indem. Ins. Co., No. 21-cv-7387 (LJL), 2022 WL 17177852, at *15 (S.D.N.Y. Nov. 23, 2022).

judgment dismissing Zurich's cross claim is also denied at this time.  Last, for the reasons set forth supra at n.3, by September 28, 2023, all parties are directed to either: (i) re-file their motions to seal setting forth the specific reasons that their proposed redactions should overcome the presumption of public access; or (ii) file unsealed and unredacted versions of any documents related to the instant motions that are currently sealed on the public docket.  The Clerk of Court is respectfully directed to terminate all open motions (Dkt. 20-cv-9206, ECF Nos. 98, 103, 112; Dkt. 22-cv-0092, ECF Nos. 70, 77).[37]

SO ORDERED.

Dated:     New York, New York
           August 29, 2023

                                    _____
                                     NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE

---

[37] The Court acknowledges that Polcom requested oral argument, see Polcom Br. However, given the purely legal nature of the argument and the extensive briefing, the Court determined that oral argument was not necessary under the circumstances.